IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 6, 2008

Charles R. Fulbruge III
Clerk

No. 07-40145

JESUS NATIVIDAD SANTOS-SANCHEZ

Petitioner-Appellant

v.

UNITED STATES OF AMERICA

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, CLEMENT, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

This case primarily involves whether defense counsel or a trial judge must inform a criminal defendant of the immigration consequences of a guilty plea. The district court concluded that Jesus Natividad Santos-Sanchez ("Santos-Sanchez") had failed to establish that his counsel provided ineffective assistance or that his plea was involuntary. For the following reasons, we affirm the ruling of the district court.

I.  BACKGROUND

Santos-Sanchez has been a legal resident alien of the United States since 2001.  On September 6, 2003, Santos-Sanchez drove into a United States Border Patrol checkpoint approximately fifteen miles north of Laredo, Texas.  During

an inspection, agents discovered that one of Santos-Sanchez's passengers was an undocumented alien. Santos-Sanchez was then arrested and charged with aiding and abetting the illegal entry of an alien in violation of 8 U.S.C. § 1325 and 18 U.S.C. § 2(a).

Two days later, Santos-Sanchez appeared before a magistrate judge and pleaded guilty. Before entering his plea, Santos-Sanchez consulted with Assistant Federal Public Defender Myrna Montemayor ("Montemayor"). Another Assistant Federal Public Defender, Paul C. Saenz ("Saenz"), represented Santos-Sanchez during his plea colloquy. The magistrate judge sentenced Santos-Sanchez to one year of supervised probation and assessed a $100 fine and a $10 special assessment. Santos-Sanchez completed his probation without incident.

As a result of his guilty plea, the Department of Homeland Security ("DHS") brought removal proceedings against Santos-Sanchez. DHS alleged that Santos-Sanchez was removable because he had knowingly encouraged, induced, assisted, abetted, or aided another alien to illegally enter the United States within five years of his entry into the country. See 8 U.S.C. § 1227(a)(1)(E)(i). An immigration judge ("IJ") initially determined that Santos-Sanchez was not removable based upon his conviction. The Board of Immigration Appeals later disagreed, vacating the IJ's decision and remanding the case for a new ruling.

The IJ postponed entering the new ruling, however, due to Santos-Sanchez's filing a petition for a writ of coram nobis. Santos-Sanchez filed this petition with the magistrate judge that had accepted his guilty plea and sentenced him. In his petition, Santos-Sanchez alleged that his counsel provided ineffective assistance and that his guilty plea was involuntary. After a hearing and filings from both Santos-Sanchez and the government, the magistrate judge

granted the petition for a writ of coram nobis, vacating Santos-Sanchez's conviction and ordering a new trial.

The government then moved the district court to strike the magistrate judge's order and remove the case to the district court. The district court granted the motion, holding that the magistrate judge lacked jurisdiction to decide the petition. The district court thus vacated the magistrate judge's decision and noted that the petition remained pending before the district court. The district court later denied Santos-Sanchez's petition for a writ of coram nobis. This timely appeal followed.

## II. STANDARD OF REVIEW

We review the district court's assumption of subject matter jurisdiction de novo. Singh v. Duane Morris LLP, 538 F.3d 334, 337 (5th Cir. 2008). On appeal from a district court's denial of a petition for a writ of coram nobis, we review factual findings for clear error, questions of law de novo, and the district court's ultimate decision to deny the writ for abuse of discretion. See United States v. Mandanici, 205 F.3d 519, 524 (2d Cir. 2000); Alikhani v. United States, 200 F.3d 732, 734 (11th Cir. 2000). We note that "[a] district court abuses its discretion when it bases its decision on an erroneous legal conclusion or on a clearly erroneous finding of fact." James v. Cain, 56 F.3d 662, 665 (5th Cir. 1995) (citing McGary v. Scott, 27 F.3d 181, 183 (5th Cir. 1994)).

## III. DISCUSSION

A.    Jurisdiction

Santos-Sanchez argues that the district court erred in vacating the magistrate judge's order. The district court held that the magistrate judge lacked jurisdiction because (1) delegation of such authority to a magistrate judge would violate Article III of the Constitution, and (2) the district court had not referred the case to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) or § 636(c)(1). We affirm the district court's conclusion solely on the lack of referral.

Santos-Sanchez first suggests that the magistrate judge had authority to hear his petition because she was the judge who sentenced him. He notes that "[a] coram nobis proceeding is brought in the sentencing court, like a § 2255 motion." United States v. Cooper, 876 F.2d 1192, 1194 (5th Cir. 1989) (italics omitted), abrogated on other grounds by Smith v. Barry, 502 U.S. 244 (1992). As Santos-Sanchez pleaded before and was sentenced by a magistrate judge, he suggests that the magistrate judge was the only proper forum in which to file his petition. Santos-Sanchez essentially argues that the magistrate judge's statutory authority to sentence him implicitly included the authority to hear his petition for a writ of coram nobis.

In determining whether a magistrate judge has the authority to address a particular claim, we ask first whether Congress intended for the magistrate judge to perform that task, and then whether such exercise of authority is constitutional. See United States v. Johnston, 258 F.3d 361, 363–64 (5th Cir. 2001); United States v. Dees, 125 F.3d 261, 264 (5th Cir. 1997). Congress explicitly granted a magistrate judge the authority to conduct misdemeanor trials and impose sentences for petty offenses in 28 U.S.C. § 636(a). That same section, however, also includes two distinct avenues for a magistrate judge to hear applications for post-trial relief (such as a petition for a writ of coram nobis). Under § 636(b)(1)(B), a district court can refer an application for post-trial relief to a magistrate judge for hearings and a recommended disposition. Under § 636(c)(1), a magistrate judge can hear and decide any civil case, including civil applications for post-trial relief, when the district court designates it to do so and the parties consent. We do not think that Congress would explicitly provide two ways for a magistrate judge to hear a petition for a writ of coram nobis but silently intend that the magistrate judge's authority over certain criminal matters include a third. In light of these provisions, we do not interpret the magistrate judge's authority to sentence Santos-Sanchez as

inherently including the authority to hear a subsequent petition for a writ of coram nobis.

Santos-Sanchez also argues that the magistrate had jurisdiction pursuant to 28 U.S.C. § 636(c)(1). Section 636(c)(1) provides, in pertinent part,

> Upon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves.

Accordingly, for the magistrate judge to hear Santos-Sanchez's petition for a writ of coram nobis pursuant to § 636(c)(1), (1) the parties must have consented to proceed before the magistrate judge, (2) the proceeding must be a civil matter, and (3) the district court must have specially designated the magistrate judge to exercise such jurisdiction.

The parties agree that the petition was a civil matter but dispute whether the government consented to the proceedings before the magistrate judge. We see a more fundamental error, however, in the lack of a special designation by the district court. Although neither party raises the issue of special designation, "[t]he district court's order of reference, or special designation, pursuant to § 636(c)(1), is a jurisdictional concern" that we must examine, sua sponte if necessary. Hill v. City of Seven Points, 230 F.3d 167, 168 (5th Cir. 2000). "[W]hen the magistrate enters judgment pursuant to 28 U.S.C. § 636(c)(1), absence of the appropriate consent and reference (or special designation) order results in a lack of jurisdiction . . . ." Mendes Junior Int'l Co. v. M/V Sokai Maru, 978 F.2d 920, 924 (5th Cir. 1992). There is no indication in the record that the district court ever referred or specially designated Santos-Sanchez's petition to the magistrate judge, and the district court noted that it had not done so. The magistrate judge thus did not have jurisdiction to hear Santos-Sanchez's petition under § 636(c)(1).

Consequently, we affirm the district court's conclusion that the magistrate judge lacked jurisdiction to hear Santos-Sanchez's petition. Because we hold that the magistrate judge lacked jurisdiction on statutory grounds, we express no opinion as to the district court's conclusion that the magistrate judge's exercise of jurisdiction in the present case would violate Article III of the Constitution. We thus turn to the merits of Santos-Sanchez's appeal from the district court's judgment.

B.     Merits of the Writ of Coram Nobis

In United States v. Esogbue, this court described the writ of coram nobis as follows:

> The writ of coram nobis is an extraordinary remedy available to a petitioner no longer in custody who seeks to vacate a criminal conviction in circumstances where the petitioner can demonstrate civil disabilities as a consequence of the conviction, and that the challenged error is of sufficient magnitude to justify the extraordinary relief.

357 F.3d 532, 534 (5th Cir. 2004) (quotation omitted). The writ of coram nobis exists "to correct errors 'of the most fundamental character,'" id. at 535 (quoting United States v. Morgan, 346 U.S. 502, 512 (1954)), and "will issue only to correct errors resulting in a complete miscarriage of justice," Jimenez v. Trominski, 91 F.3d 767, 768 (5th Cir. 1996). Further, "[t]he writ will issue only when no other remedy is available and when sound reasons exist for failure to seek appropriate earlier relief." United States v. Dyer, 136 F.3d 417, 422 (5th Cir. 1998) (quotation and alteration omitted).

As the district court correctly concluded, a writ of coram nobis is the proper avenue for Santos-Sanchez to seek relief. Santos-Sanchez is no longer in custody and seeks to vacate his misdemeanor aiding and abetting conviction because it triggered removal proceedings against him. Cf. Esogbue, 357 F.3d at 534. The district court also held that Santos-Sanchez had established sound

reasons for failing to seek appropriate earlier relief, and the parties do not dispute this conclusion.

Santos-Sanchez has no avenue for relief from deportation,[1] and raises three errors that he asserts warrant coram nobis relief based on the advice he received and did not receive regarding the certainty of his deportation. First, he argues that his defense counsel rendered ineffective assistance by affirmatively misrepresenting the immigration consequences of his guilty plea. Second and alternatively, Santos-Sanchez argues that his defense counsel rendered ineffective assistance by failing to warn him of the immigration consequences of his guilty plea. Finally, Santos-Sanchez argues that his plea was involuntary due to the magistrate judge's failure to admonish him of the immigration consequences of his guilty plea. We address each argument in turn.

1. Ineffective Assistance of Counsel Due to Affirmative Misrepresentation

As to Santos-Sanchez's first argument, ineffective assistance of counsel is an error that can warrant coram nobis relief. See United States v. Castro, 26 F.3d 557, 559 (5th Cir. 1994). The standard for establishing ineffective assistance of counsel is the familiar test from the Supreme Court's decision in Strickland v. Washington: the defendant must establish that (1) counsel's performance was deficient, and (2) counsel's performance prejudiced the defendant. Castro, 26 F.3d at 559 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)); United States v. Banda, 1 F.3d 354, 356 (5th Cir. 1993); see also

---

[1] Under 8 U.S.C. § 1227(a)(1)(E)(i),

[a]ny alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.

Santos-Sanchez became deportable upon pleading guilty to aiding and abetting the illegal entry of an alien in violation of 8 U.S.C. § 1325 and 18 U.S.C. § 2. And because Santos-Sanchez has not been either present in or a legal resident of the United States for a sufficient period of time, he is ineligible for discretionary relief under 8 U.S.C. § 1229b.

Hill v. Lockhart, 474 U.S. 52, 57 (1985) (holding that the Strickland test applies to claims of ineffective assistance of counsel in plea bargaining). We determine whether counsel's performance was deficient by measuring it against "an objective standard of reasonableness under prevailing professional norms." Castro, 26 F.3d at 559 (quotation omitted). As to prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (quotations and alteration omitted).

Santos-Sanchez asserts that his counsel misled him into thinking that he had a chance of remaining in the country if he pleaded guilty. Montemayor stated in her affidavit that "it is [her] practice to always advise resident alien defendants that there is a possibility that they may be deported as a result of their plea of guilty to the criminal charge against them, and that they may want to consult with an immigration lawyer."[2] Santos-Sanchez argues that this statement was an affirmative misrepresentation of the law; Montemayor indicated that deportation was possible, when in fact it was almost certain. Santos-Sanchez thus argues that Montemayor misled him into thinking that he could plead guilty but avoid deportation. Further, according to Santos-Sanchez's affidavit, Saenz gave Santos-Sanchez an immigration lawyer's business card and suggested that Santos-Sanchez call the lawyer if he had any problems with immigration. Santos-Sanchez argues that this only compounded Montemayor's misrepresentation. By leaving him with the impression that deportation was not certain, Santos-Sanchez argues, his counsel's performance was deficient.[3]

---

[2] Montemayor further stated that she was "sure that [she] informed [Santos-Sanchez] of this, as it is [her] habit to do so in cases involving resident aliens."

[3] The district court treated Santos-Sanchez's ineffective assistance of counsel claims primarily as a failure to warn. Santos-Sanchez urges us to treat his claims as an affirmative misrepresentation and, alternatively, a failure to warn. Even when we address both, however, we reach the same conclusion as the district court.

In support of his argument, Santos-Sanchez relies on United States v. Kwan, 407 F.3d 1005 (9th Cir. 2005), and United States v. Couto, 311 F.3d 179 (2d Cir. 2002). In both Kwan and Couto, attorneys indicated to their clients that guilty pleas to aggravated felonies would not necessarily result in deportation when deportation was actually a near certainty. See Kwan, 407 F.3d at 1008–09; Couto, 311 F.3d at 187. In both cases, the court held that an attorney's misleading statements about the deportation consequences of a guilty plea constituted objectively unreasonable conduct that satisfies Strickland's first prong. See Kwan, 407 F.3d at 1015–17; Couto, 311 F.3d at 188.

The attorneys' actions in Kwan and Couto, however, were quite different from the public defenders' actions in the present case. In Couto, the attorney "assured [his client] that they could deal with her immigration problem after the guilty plea." 311 F.3d at 183. The Second Circuit found fault in the attorney's representations that "there were a lot of things that could be done to avoid deportation" and that his client "should not worry about it." Id. at 184. According to the court, these statements "affirmatively misled [the defendant] into believing there were things that could be done to avoid deportation (when in fact there were none)." Id. at 187.

In Kwan, the attorney responded to the defendant's specific questions regarding the deportation consequences of a guilty plea, gave erroneous advice, and "represented himself as having expertise on the immigration consequences of criminal convictions." 407 F.3d at 1015–16. The Ninth Circuit emphasized that the attorney "made an affirmative representation to [the defendant] that he had knowledge and experience regarding the immigration consequences of criminal convictions." Id. at 1016. Moreover, the court noted that

> [i]f counsel did not have the requisite competence in immigration law, or if counsel did not plan on maintaining the requisite competence, he should not have advised [the defendant] regarding the immigration consequences of his plea without referring [the

defendant] to an immigration lawyer or consulting himself with an immigration lawyer in the first place.

Id.

In contrast, neither Montemayor nor Saenz represented that they had any expertise in immigration law, nor did they suggest that Santos-Sanchez could probably avoid deportation after pleading guilty. They also did not purport to answer any questions Santos-Sanchez had regarding deportation. Further, Montemayor's statement put Santos-Sanchez on notice that there were potential immigration consequences of his guilty plea and suggested that he should seek out an immigration attorney. Saenz even gave Santos-Sanchez the name of an immigration attorney that he could contact. While Montemayor's statement that deportation was "possible" might indicate that deportation was not a certainty, it is not so inherently misleading in this context that it constitutes an affirmative misrepresentation of the law. Cf. Zhang v. United States, 543 F. Supp. 2d 175, 183 (E.D.N.Y. 2008) (noting that an attorney's advice regarding the immigration consequences of a guilty plea was "mistaken," but not an affirmative misrepresentation). Under these circumstances, we cannot hold that the behavior of Santos-Sanchez's public defenders was objectively unreasonable. Consequently, Santos-Sanchez has failed to establish deficient performance due to affirmative misrepresentation.

2.      Ineffective Assistance of Counsel Due to Failure to Warn

In his second argument, Santos-Sanchez asserts that the district court erred in finding no ineffective assistance due to his counsel's failure to warn him of the immigration consequences of a guilty plea. The district court held that counsel was not required to advise Santos-Sanchez of the immigration consequences of his guilty plea because, under our decision in Banda, deportation is a collateral consequence of a guilty plea. See Banda, 1 F.3d at 355 (holding "that an attorney's failure to advise a client that deportation is a

possible consequence of a guilty plea does not constitute ineffective assistance of counsel").

This court has clearly stated that "[d]efense counsel has done all he must under the Constitution when he advises his client of the direct consequences of a guilty plea." Id. at 356. That is, counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never deficient performance under Strickland.[4] Santos-Sanchez suggests, however, that our decision in Banda left open the question of whether an attorney's failure to advise a client that deportation is a certain consequence of a guilty plea constitutes ineffective assistance of counsel. Santos-Sanchez suggests that certain deportation is a direct consequence of a guilty plea, and an attorney must therefore inquire about her client's immigration status and inform her client of this consequence.

Santos-Sanchez misconstrues our decision in Banda. In Banda, we held that deportation—not the possibility of deportation—was a collateral consequence of the criminal process. See id. at 356 (likening deportation, not the possibility of deportation, to the other collateral consequences of a guilty plea such as loss of the right to vote and right to travel, and noting that "[f]ailure by counsel to advise a client of these or any other collateral eventualities would not constitute a Sixth Amendment violation"). The likelihood that a defendant would be deported was irrelevant to this determination. Therefore, under Banda, counsel's failure to inquire into Santos-Sanchez's immigration status and

---

[4] We recognize that some commentators have criticized this rule as inconsistent with Strickland. See, e.g., Gabriel J. Chin & Richard W. Holmes, Jr., Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 CORNELL L. REV. 697 (2002). Absent reconsideration en banc or an intervening Supreme Court decision, however, we are bound to follow the holding of Banda. See Billiot v. Puckett, 135 F.3d 311, 316 (5th Cir. 1998) ("As a general rule, one panel may not overrule the decision of a prior panel, right or wrong, in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court.").

inform him of his likely deportation was not deficient performance and thus did not constitute ineffective assistance of counsel.

Santos-Sanchez notes that recent changes in immigration laws, particularly the closure of avenues for discretionary relief from deportation in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, have rendered deportation a certainty for some defendants that enter guilty pleas. Santos-Sanchez suggests changes in the law have so altered the nature of deportation that it is now in some cases a direct consequence of a guilty plea. Santos-Sanchez thus asserts that, at least in cases where deportation is a near-certain consequence of a guilty plea, counsel must inform defendants of the immigration consequences of their guilty plea to provide effective assistance.

This argument has been working its way through the circuit courts. In the first case to address this issue, the First Circuit held that IIRIRA did not alter the court's prior holding that deportation was a collateral consequence of a guilty plea. See United States v. Gonzalez, 202 F.3d 20, 28 (1st Cir. 2000). The court first noted that "the immigration consequences of a plea are collateral irrespective of the reason for which an alien is deemed deportable." Id. at 26. It went on to state that

> [w]hat renders the plea's immigration effects collateral is not that they arise virtually by operation of law, but the fact that deportation is not the sentence of the court which accepts the plea but of another agency over which the trial judge has no control and for which he has no responsibility.

Id. at 27 (quotations and alterations omitted). The court reasoned that, regardless of how automatic IIRIRA might have rendered deportation, it was still beyond the control and responsibility of the district court. Id. The First Circuit thus "reject[ed] the argument that [IIRIRA has] so altered the relationship between conviction and deportation that revisitation of [its] prior

holdings on that relationship [was] required." Id. at 28. Consequently, the collateral nature of deportation "bar[red] any ineffective assistance claims based on an attorney's failure to advise a client of his plea's immigration consequences." Id.

The Tenth Circuit came to the same conclusion in Broomes v. Ashcroft, 358 F.3d 1251 (10th Cir. 2004). Like the First Circuit, the Tenth Circuit had previously held that "'deportation is a collateral consequence of the criminal proceeding and therefore the failure to advise does not amount to ineffective assistance of counsel.'" Id. at 1256 (quoting Varela v. Kaiser, 976 F.2d 1357, 1358 (10th Cir. 1992)). In Broomes, the court held that neither IIRIRA nor the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, altered the collateral nature of deportation. Broomes, 358 F.3d at 1256–57. As the court noted, "[a] consequence is collateral if it 'remains beyond the control and responsibility of the district court in which that conviction was entered.'" Id. at 1256 (quoting Gonzalez, 202 F.3d at 27). The Tenth Circuit thus concluded that

> [s]tate courts have no more control over whether a criminal defendant will be deported today than they did prior to the 1996 Acts. Accordingly, deportation remains a collateral consequence of a criminal conviction, and counsel's failure to advise a criminal defendant of its possibility does not result in a Sixth Amendment deprivation.

Id. at 1257.

We agree with the First and Tenth Circuits that the changes wrought by IIRIRA have not so altered the nature of deportation as to wholly undermine our holding in Banda. We, like our sister circuits, have drawn a bright line between the direct and collateral consequences of a guilty plea and require that counsel advise a defendant of only the former. And also like our sister circuits, we have limited the direct consequences of a guilty plea to "the immediate and automatic

consequences of that plea such as the maximum sentence length or fine." Duke v. Cockrell, 292 F.3d 414, 417 (5th Cir. 2002). Under Banda, regardless of certainty, deportation is a collateral consequence of a guilty plea.[5] Consequently, Santos-Sanchez's counsel was not required to inform him of the immigration consequences of his guilty plea for counsel's assistance to be effective.

Because we hold that Santos-Sanchez has failed to prove that his counsel's performance was deficient, we need not address whether he has established prejudice. See United States v. Stewart, 207 F.3d 750, 751 (5th Cir. 2000) (per curiam) ("A court need not address both components of an ineffective assistance of counsel claim if the movant makes an insufficient showing on one."). Thus, we affirm the district court's conclusion that Santos-Sanchez failed to establish that his counsel provided ineffective assistance due to either affirmative misrepresentation or failure to warn.

3.    Voluntariness of the Guilty Plea

Santos-Sanchez asserts that the magistrate judge's failure to admonish him of the immigration consequences of his guilty plea rendered his plea involuntary. The district court held that the magistrate judge was not required to advise Santos-Sanchez of such consequences because, under our decision in Banda, deportation is a collateral consequence of a guilty plea.

A criminal defendant entering a guilty plea must do so knowingly, voluntarily, and intelligently. United States v. Guerra, 94 F.3d 989, 995 (5th Cir. 1996); see also Hill, 474 U.S. at 56. Thus, "the defendant must have 'a full understanding of what the plea connotes and of its consequence.'" United States v. Hernandez, 234 F.3d 252, 255 (5th Cir. 2000) (quoting Boykin v. Alabama, 395

---

[5] We acknowledge that deportation is a harsh consequence. Yet this court and others have found many harsh consequences of a guilty plea to be collateral, including revocation of parole, civil commitment, disenfranchisement, revocation of public benefits, and restrictions on travel. Chin & Holmes, supra, at 705–06.

U.S. 238, 244 (1969)). We have long held, however, that "[t]he defendant need only understand the direct consequences of the plea; he need not be made aware every [sic] consequence that, absent a plea of guilty, would not otherwise occur." Id. (citing Trujillo v. United States, 377 F.2d 266, 289–69 (5th Cir. 1967)); see also Duke, 292 F.3d at 416; Banda, 1 F.3d at 356.

We have previously held that neither due process nor Federal Rule of Criminal Procedure 11 require that a court advise a defendant of the collateral consequences of a guilty plea. See Banda, 1 F.3d at 356; United States v. Posner, 865 F.2d 654, 660 (5th Cir. 1989) (noting that "[t]he failure to advise a defendant of collateral consequences of a plea of guilty does not render it involuntary"). Under Banda, deportation is one such collateral consequence. Thus, the magistrate judge's failure to warn Santos-Sanchez of the immigration consequences of his guilty plea did not render that plea involuntary.

Santos-Sanchez again asserts that changes in immigration laws have changed the collateral nature of deportation such that judges must admonish defendants of the immigration consequences of a guilty plea for that plea to be voluntary. The Ninth Circuit rejected this argument in United States v. Amador-Leal, 276 F.3d 511 (9th Cir. 2002). Like the First Circuit and Tenth Circuit, the Ninth Circuit had held prior to IIRIRA that the immigration consequences of a guilty plea are collateral to that plea. Id. at 514 (discussing Fruchtman v. Kenton, 531 F.2d 946 (9th Cir. 1976)). The court in Amador-Leal noted that "[t]he distinction between a direct and collateral consequence of a plea turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment." Id. at 514 (quotation omitted). While recognizing that both IIRIRA and AEDPA have wrought significant changes on the immigration consequences of a guilty plea, the Ninth Circuit emphasized that deportation still did not occur until after the defendant serves her sentence and remained under the control and responsibility

of another governmental agency. Id. at 516. The court concluded that neither IIRIRA nor AEDPA has so altered the nature of deportation as to render it a direct consequence of a guilty plea. Id. at 517. And because a court must advise a defendant only of the direct consequences of a guilty plea, "district courts are not constitutionally required to warn defendants about potential removal in order to assure voluntariness of a plea." Id.

The Sixth Circuit reached the same conclusion in El-Nobani v. United States, 287 F.3d 417 (6th Cir. 2002). While the Sixth Circuit had never before addressed whether deportation was a direct or collateral consequence of a guilty plea, the court in El-Nobani held that deportation was collateral even in light of IIRIRA's changes to immigration law. Id. at 421. The court noted that "the automatic nature of the deportation proceeding does not necessarily make deportation a direct consequence of the guilty plea[; a] collateral consequence is one that 'remains beyond the control and responsibility of the district court in which that conviction was entered.'" Id. (quoting Gonzalez, 202 F.3d at 27). Since a judge must admonish a defendant only of the direct consequences of a guilty plea, the Sixth Circuit concluded that "the fact that [a defendant] was unaware of the deportation consequences of his pleas does not make his pleas unknowing or involuntary." Id.

Again, we agree with the other circuits that have addressed this issue.[6] For the reasons discussed above, the magistrate judge was not required to inform Santos-Sanchez of the immigration consequences of his guilty plea for that plea to be voluntary. Thus, we affirm the district court's conclusion that Santos-Sanchez failed to establish that his guilty plea was involuntary.

---

[6] Only the Second Circuit has suggested, without holding, that IIRIRA and AEDPA might have altered the collateral nature of deportation. See Couto, 311 F.3d at 188–91.

## IV. CONCLUSION

Because Santos-Sanchez has established no factual or legal errors in the district court's ruling and has not suggested any abuse of discretion, we AFFIRM the district court's denial of his petition for a writ of coram nobis.

AFFIRMED.